# EXHIBIT "Q"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

TRUSTEES OF SHEET METAL WORKERS
INTERNATIONAL ASSOCIATION-LOCAL NO. 38,
VACATION FUND, SHEET METAL WORKERS
INTERNATIONAL ASSOCIATION LOCAL NO. 38
INSURANCE AND WELFARE FUND, SHEET
METAL WORKERS INTERNATIONAL
ASSOCIATION LOCAL NO. 38 PROFIT SHARING
PLAN, SHEET METAL WORKERS LOCAL 38
LABOR MANAGEMENT COMMITTEE AND
TRUST, SHEET METAL WORKERS LOCAL 38
CRAFT TRAINING FUND, SHEET METAL
WORKERS NATIONAL PENSION FUND, SHEET
METAL WORKERS LOCAL 38 CRAFT TRAINING
BUILDING FUND, TRUST FUNDS established and
administered pursuant to federal law,

**AFFIDAVIT OF RICHARD J. HOPWOOD**

Docket No.: 09-cv-5088(KK)

Assigned to:
Hon. Kenneth M. Karas

Plaintiffs,

-against-

LAWRENCE P. HOPWOOD, MARTIN M.
HOPWOOD, JR. and RICHARD J. HOPWOOD,
individually,

Defendants,
------------------------------------------------------------------ X

STATE OF NEW YORK         )
                          : ss:
COUNTY OF WESTCHESTER     )

**RICHARD J. HOPWOOD**, being duly sworn, deposes and says:

1. I am an individual residing at 12 Westwood Drive, Harrison, New York, 10528. The above captioned matter has been commenced against me as an individual. I am also the Senior Vice President and Chief Executive Officer of Richards Conditioning Corp. (hereinafter referred to as "Richards"). I have personal knowledge of the facts alleged in this matter and I submit this affidavit in opposition to the plaintiff's motion for summary judgment thereby

{NY100267.1}

disputing the claims alleged in the plaintiff's motion. The following statement is made of my own free will.

2. Richards filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, White Plains Division ("Bankruptcy Court") on April 6, 2009 ("Petition Date") and commenced bankruptcy Case No: 09-22525 (RDD) ("Bankruptcy Case"). The Bankruptcy Court has directed that trust fund claimants including Local 38 should be paid pro rata from trust fund proceeds received from each project to the trust fund claimants on such project. In March 2007, Expo Credit Corporation ("Secured Lender") purchased certain receivables from RCC, and/or extended other financial accommodations to RCC pursuant to the terms of the Factoring Agreements and as collateral for the liabilities of the RCC to Expo pursuant to the Factoring Agreement, Expo was granted a security interest covering all accounts. The Secured Lender consented to and the Bankruptcy Court approved an Interim Cash Collateral Order, governing the use of Collateral and granting to the Secured Lender a first priority perfected security interest in the Collateral.

3. The plaintiffs complaint and partial motion for summary judgment alleges that Richards failed to pay fringe benefits for Local 38 Members which were employees of Richards pursuant to a Collective Bargaining Agreement ("CBA") for the period from November 2008 through July 2009 ("Applicable Period") in the amount of $204,005.85 ("Applicable Amount"). Both Richards and I dispute those allegations and it is our position that the plaintiffs have failed to demonstrate to this Court that the defendants are personally liable for any monies to the plaintiffs since there are numerous questions of fact in this matter.

4. Richards has not signed a collective bargaining agreement with Local 38 since 1994 and such agreement expired in 1997. Richards did not pay dues for calendar years 2008,

2009 and 2010 to the SMACNA Southeastern NY, Inc. ("Employers Association") which is listed as a Local Chapter of the Sheet Metal and Air Conditioning Contractor's National Association ("SMACNA"). Richards has not been listed as a member of the Employers Association on their web site from January 2008 to the present. Richards has not signed nor have the Trustees, Local 38, the plaintiffs or the Employers Association produced any documents where Richards agreed to be bound by the collective bargaining agreement.

     5.    Neither Richards nor I have received the two page document dated April 30, 2002 which was attached to plaintiffs' motion papers as Exhibit B. Neither Richards nor I received a copy of the April 22, 2002, letter. Neither Richards nor I have any records indicating that this letter was sent to Richards by either mail or facsimile. Neither Richards nor I signed a collective bargaining agreement that was effective during the applicable time periods alleged by the plaintiffs. Neither Richards nor I agreed to be bound by a collective bargaining agreement.

     6.    In addition, Richards has not executed or received any documentation that states by paying dues Richards is obligated to be bound by the terms of the collective bargaining agreement. At the time the purported payment agreement was prepared and provided by Local Union 38 (Plaintiffs' Exhibit "F"), I was advised by Local 38 that Richards had signed a collective bargaining agreement. I have since learned through discovery in this matter that Richards was not a signatory to the collective bargaining agreement, contrary to the document prepared by Local 38. Again, Richards is not a party to the collective bargaining agreement as described in the complaint. When there is an Employers Association representing the Employers in a collective bargaining agreement, it is customary in the New York and Connecticut areas for the Employers that agree to be bound to the terms of a collective bargaining agreement to sign at

least the signature page of the collective bargaining agreement. Richards did not sign any documents that it was a party to the collective bargaining agreement with Local 38.

7.  The Local 38 Trustees and the Employers Association are entrusted with the obligation to insure that the members of the union receive their wages and benefits. Neither Richards nor I nor RJH are trustees of Local 38. The Trustees of Local 38 include the president of the Employers Association, officers of Local 38 and principals of contractors competing with Richards for business in a difficult economic climate. Neither Richards nor I am responsible for Local 38 and the Employers Association keeping accurate books and records and insuring that Richards is properly signed with the Local Union or has the financial capability to honor its obligations. Richards executed documents over the past 2 years with other unions confirming that Richards was bound under their contract despite being a member of an association for such unions and provided bonds to these unions.

8.  The Trustees failed to require that Richards execute a contract with Local 38 in the last 3 years, request a financial statement from Richards at any time in the last 10 years, require that Richards be a continuing member of the Employers Association or request that Richards post a bond as may be required by signatory's to the Local 38 contract. The trustees failed to perform any of these typically required actions, despite numerous instances where Richards was late with payments. RJH and I should not be responsible for the failure of the Local 38 Trustees to honor their obligations to the members as Trustees. In fact, subsequent to Richards's Petition Date, Local 38 circulated a letter from its counsel requiring contractors which were signed with Local 38 to provide a bond or pay the benefits weekly to Local 38.

9.  The Trustees have alleged in their complaint and motion papers that Richards has not paid benefits to certain Local 38 Members who were employees of Richards. Except in one

instance, the Local 38 Members were not employees that were provided to Richards by the Local 38 Union. Most of these employees that worked during the Applicable Period were employees that originally worked for Richards as non-union employees and were high school classmates, neighborhood acquaintances and walk-ins from the neighborhood. Subsequently, Richards recommended each of these employees contact the Union to become a member. As an example, Henri Salvador was sent to Richards under a work internship program from a Westchester County Agency. Richards gave Henri Salvador an opportunity to work for Richards for a summer in the fabrication shop and then Richards recommended that he apply to the Union to become a member. Richards provided these men to the Union. Richards kept several of these men during problems with drugs, alcohol, gambling, loaned them money when needed and kept them employed even when work for Richards was slow.

10. The Local 38 contract covers sheet metal work. This information is available to the public and knowing this information does not mean that Richards was a signatory to the collective bargaining agreement or bound by the collective bargaining agreement. Over the years and in particular, during the Applicable Period, Richards permitted the Local 38 Members to perform work not covered by the jurisdiction clause under the Local 38 Contract, including Service work with Richards' service union employees, maintenance and repair of the warehouse and offices of Richards, insulation work and the receiving, handling storing, modifying and delivering of over 2000 Hot Water Panels for the Sciame Cooper Union Project, which were the jurisdiction of Steamfitters. Richards permitted this to keep them employed.

11. Richards permitted the Trustees to audit Richards payroll records. The Trustees prepared an audit report which is annexed to their motion papers as Exhibit "E". By letter dated August 21, 2009, Richards disputed the findings in the audit. See Defendants' Exhibit "E". The

Auditor claims that Richards underpaid the benefits for the employees listed in the Audit Report in an amount equal to $58,628.30. Richards disputed that it is obligated to pay such amount because each of the employees specifically agreed to work for Richards without benefits and they were performing non jurisdictional work. I specifically met with each of the employees and told them that Richards was having severe financial problems and that Richards would have to lay off long term employees unless they agreed to a reduction in benefits. Each of such employees agreed to work without benefits for the omitted hours. Richards does not believe that it is obligated to pay such benefits for such employees because Richards was not party to the Collective Bargaining Agreement. The long term employees benefited by receiving more than $32 an hour for the work performed by them for these hours, most if not all of them would have been laid off, all of these men agreed to work under these conditions and they were given the option to find employment in the meantime at another Contractor. As an example one long term employee that worked for Richards for more than 20 years left without notice to take another job. During his term of employment Richards kept him employed despite major drug and alcohol problems, several arrests and detentions for domestic abuse and numerous failures to show for work or tardiness without reason. In addition, Richards paid thousands of dollars to these employees during the period of time covered by the audit for additional compensation and/or the reimbursement of expenses not required to be paid by Richards under the collective bargaining agreement, which Richards is not a party to. The business agent for Local 38 who visited the facilities several times during the period the hours were allegedly underreported, was made aware of the proposal to keep the men working rather than go to a shortened week or lay off Local 38 Members permanently.

12. When Mark Modgeleski asked Richards about the Audit and the underpayment of hours, Richards agreed, despite the fact that the men agreed to work for no benefits for those hours (they could have left if they were unhappy with the agreement) and the fact that the hours in question were for work performed was not covered by the Local 38 Contract, not to dispute the audit and to pay such amount if Local 38 cooperated with RCC in collecting on claims from entities that owed Richards monies, such as Sciame. Mark Modgeleski the fund administrator agreed to cooperate. Local 38 through its counsel then did not honor this commitment.

13. The Alleged personal guarantee is not an unconditional guarantee and RJH and I signed because we believed that Local 38 would have to exhaust all remedies prior to seeking a claim against Richards. In addition, at the time it was executed both myself, RJH and Richards believed that Richards was a party to a signed collective bargaining agreement. Local 38 drafted the purported guaranty and included that language in the guaranty. We have since learned through discovery that Richards is not a signatory to the collective bargaining agreement. I note that it is possible that Local 38 is pursuing claims against Richards, myself and RJH because the trustees themselves may be liable for not properly contracting with Richards and possibly other contractors.

14. Prior to January 2006, Richards used Business Works accounting software to keep track of all its financial records. Subsequent to October 2006, Richards purchased the Timberline Accounting Software which was specifically designed for the Construction Industry. All payrolls were produced initially by ADP and in 2007 Richards switched to Compu-Pay. Payrolls were downloaded directly into the Timberline Software System. Richards kept accurate books and records of all transactions. The Examiner Report on Books and Records concluded that Richards can track all billings and particular costs of a project, cost of direct labor is charged to each

7

project, the Debtor reconciles its banks account and accounts receivables and accounts payable (except with the Sciame Cooper Union Project because Sciame has not, provided to date, to whom they paid directly). In addition, the Examiner Trust Fund Report concluded that Richards was in compliance with section 75 of the Lien Law with respect to keeping books and records.

15. The complaint and motion allege that I commingled corporate funds. This is a false statement. The funds that were moved between the Richards account and the subnom account were the proceeds of insider loans and not corporate funds. The Examiner Avoidance Action Report confirmed that as of September 30, 2007, Insiders had contributed or loaned to Richards more than $902,000 of which more than $527,000 was loaned by me to Richards. Subsequent to that date insiders including me, loaned more than $1,524,000 to Richards. That is the amount that I personally loaned Richards. See Examiner's Reports annexed hereto as Exhibits F-I. This means that the total amount of Insider Loans as of the Petition Date was in excess of $2,800,000 ('Insider Loans"). Richards owed me more than $2,031,000 as of the Petition Date. None of the Insider Loans have been repaid to date. Therefore, even though I used a subnom account as a credit line loan account for Richards there was no commingling of funds because at the time I commenced using the account Richards owed me more than $600,000. See Examiner's Reports annexed hereto as Exhibits F-I.

16. The Examiner Avoidance Report confirms that at no point in time did the transfers from Richards' account to the subnom exceed the outstanding balance of the Insider Loans. The Examiner Avoidance Report and the Insider Statement filed with the Bankruptcy Court confirms that although the method I used for the accounts was unorthodox the money that was transferred back and forth was Insider Loan Proceeds not funds received by Richards and that I utilized the accounts in a manner that benefited Richards exclusively. This system is no

different than setting up a sweep account for reducing the interest on loans with a financing entity. However, Richards' bank did not have a sweep account at the time. See Examiner's Reports annexed hereto as Exhibits F-I.

17.     The Insider Loan proceeds were more than sufficient to cover RJH and my salary, vehicle costs for vehicles not used in the business and to pay necessary operating expenses including rent to HFP (the owner of the property where Richards place of business is located). Richards and MMH are under no obligation to use personal funds loaned to Richards to pay fringe benefits to Local 38. At no time did I pay RJH's salary, my salary or non-essential car expenses, or operating expenses which were not fabrication costs, with funds that would have been available to pay Local 38 fringe benefits.

18.     The Complaint alleges that Richards was obligated to pay Local 38 Fringe benefits before it pays other trust fund claimants. Pursuant to New York Lien Law, Richards has the absolute discretion to pay any trust fund claimants that performed work or delivered material on a project from trust funds received from such project. Pursuant to the Examiner Trust Fund Report, the Examiner confirmed that Richards had the right to determine the "order and manner of payment", and Richards could favor one beneficiary of a trust over another and pay its own costs as a subcontractor or a material-man (including "insurance, financing costs and fabrication costs but not its administrative overhead). Richards was not obligated to pay Local 38 Fringe benefits over other trust fund claimants.

19.     Co-Defendant Lawrence Hopwood ("LPH") resigned from Richards in April 2008. An attempt was made first to see if the three brothers (MMH, RJH and LPH) could work something out. We met with LPH's representative Matt Kolb and proposed several scenarios. LPH refused to proceed unless he had total control of the business in contradiction of the

Richards Shareholder Agreement. MMH discussed several buy out proposals with Mr. Kolb, but nothing was agreed to because MMH and RJH could not determine the value of the business and because the Sciame Cooper Union Project represented an unknown significant positive or negative impact to Richards' business. As a result, MMH and RJH continued to pay his salary and benefits as severance pay which would be offset against any buy out if one occurred. MMH believed based upon his knowledge at the time that continuing his severance pay was reasonable. At the time we decided to continue this pay we were not aware of the fact was Richards was the low bidder on the Sciame Cooper Union Project by more than $3,000,000. In the Bankruptcy action, Richards is commencing an adversarial proceeding against Sciame for numerous causes of action in light of the false misrepresentations made by Sciame and its representatives to Richards and MMH.

20. LPH was a full time officer and shareholder of RCC for more than 30 years. In addition, during the period Richards paid him his severance he did not attempt to compete with Richards. Until March 2009, Richards believed that the Sciame Cooper Union Project would be profitable. Therefore, paying him a years severance in light of other companies policies at the time appeared to be a reasonable decision. Further, the Examiner's Avoidance Report recommended that Richards as trustee commence an avoidance action against LPH and Richards commenced such action. A default judgment has been obtained and Richards has a hearing on 11-23-2010 to finalize the judgment and proceed to file a lien against LPH's property. During the Applicable Period, MMH did not use funds that would have otherwise been payable to Local 38 to pay severance to LPH.

21. The decision to lease LPH's two cars and insure another car paid for directly by LPH was made by LPH as President of Richards at the time the leases were entered into. The

decision to lease these cars was not made by me or RJH. Please note that Richards asked that LPH return both cars. LPH refused to return the cars.

22. Local 38 has also been advised that MMH and RJH have guaranteed more than $5,000,000 of debt to Hudson Valley Bank and that such obligations were under secured due to the drop in the residential and commercial real estate market and due to the fact that the HVB stock value decreased from $60 per share to $20 per share in the last 2 years.

23. The complaint and motion maintains that Richards did not maintain proper books and records. For the period until April 2008 all of the Richards shareholders were either in the office daily or within 5 minutes of the office. All decisions requiring Corporate approval could be obtained within the office by a meeting among the Shareholders. All Loans contributed by MMH or RJH to Rchards were approved by at least 50% of the shareholders at these internal meetings. In April 2008, LPH resigned. Subsequently, the remaining shareholders which still controlled more than 50% of the shares of Richards were in the office daily. All decisions of Richards were authorized by more than 50% of the shareholders. Richards prepared formal corporate resolutions for transactions involving third parties when required by such third parties. There are no resolutions prepared by RCC for any contracts with Local 38 or in connection with the Employers Association because Richards did not sign any contracts. Richards never formally approved the Local 38 Contract directly or indirectly through the Employers Association. HVB required corporate resolutions for all RCC loans. See Corporate Resolutions annexed as Exhibits N & O for examples.

24. The plaintiffs allege that MMH and RJH failed to form a new consulting company. It was determined after consultation with tax counsel that MMH and RJH may utilize one of the two consulting companies in existence. I have retained tax counsel and due to losses

11

totaling in excess of $2.8 Million Dollars caused to MMH and RJH as a result of the RCC Bankruptcy, MMH and RJH are still in the process of analyzing its tax position.

25. Richards will be disputing Local 38's claim in Bankruptcy as to all amounts due because based upon recent investigation Richards did not sign any applicable contract with Local 38, Richards did not sign any contract with the Employers Association and did not pay dues for 2008, 2009 and 2010. Even though I testified at a 2004 examination in the bankruptcy proceeding that I had advised Mr. Modgeleski that Richards would pay the audited amount, this is considered a preference under the Bankruptcy Code and Richards as trustee cannot be bound by my statements because its investigation revealed Richards never agreed to be bound by any contract with Local 38. Therefore Richards' employees which were also members of Local 38 were hires at will on terms agreed to between Richards and the individual men. Further, Richards is investigating whether Richards has a claim against Local 38 for return of all funds and wages in excess of the 1994 rates which were paid in the six years prior to the Filing Date on non-prevailing wage rate projects. Richards estimates this amount could be in excess of $20,000 per year. Subsequent to the Petition Date Richards agreed to the payment amount and method with Local 38.

26. The complaint alleges that I made a decision to pay myself and RJH salary, pay vehicle costs for various Hopwood members and pay other operating expenses, rather than pay Local 38 for the Applicable Period. This is not true. Richards has paid or will pay in the next month, as stated above, all proceeds received from all Projects, except the Sciame Cooper Union Project during the Applicable Period. Richards has paid or will pay more than $60,000 for these projects. The alleged unpaid amounts are due if at all from the Sciame Copper Union Project. MMH and Richards had no funds from the Sciame Cooper Union Project during that period to

pay the Local 38 Members except for the wages they paid to the Local 38 Members during that period and more than $35,000 in additional payments made to the men by a non payroll check. See attached general ledger reports for the men that received additional payments from RCC.

27. As stated above Richards leased its facilities from HFP. The Examiner Avoidance Report and Examiner Trust Fund Report found that the rent charged by HFP to Richards was reasonable. HFP had a mortgage with HVB (Hudson Valley Bank). If this mortgage remained unpaid then HVB would foreclose and the Local 38 Members would not have anywhere to work because if Richards could not produce sheet metal then the men would not have work. Notwithstanding Richards' right to pay fabrication costs including rent and financing under the New York Lien Law from trust funds (as confirmed in the Examiner Trust Fund Report), these costs were also funded from the Insider Loans.

28. Notwithstanding the foregoing, I maintain that pursuant to New York law, Richards and I have the absolute right to determine who to pay when there are insufficient funds available from the Trust Funds it is receiving on a project. See Examiner's Reports annexed hereto as Exhibits F-I. During the Applicable Period Richards did not receive sufficient funds to pay the alleged fringe benefits and other third party vendors. In fact Richards has provided a Verified Statement to the Bankruptcy Court that states that Richards received $4,500,000 less than it paid and incurred in the Sciame Cooper Union Project. See Verified Statement and Supplemental Verified Statement annexed as Exhibits J & K. Richards did not receive sufficient funds from the Sciame Cooper Union Project to pay the fringe benefits alleged to be due. Local 38 is not the only trust fund claimant that was not paid in full. Federal, State and Local taxes have not been paid due to the losses suffered by Richards on the Sciame Cooper Union Project.

29. The Plaintiffs allege that I was in control and made the decisions of which vendors including Local 38 should be paid. This is not an accurate statement. During the Applicable period Local 38 Members worked almost predominantly on the Sciame Cooper Union Project. Richards has paid or will pay Local 38 for all work performed on other projects pursuant to court orders from the Bankruptcy Court. I was not in control of payments to vendors like Local 38, particularly on the Scaime Cooper Union Project because of the following:

A.  Richards had assigned its receivables to Hudson Valley Bank and while that assignment was effective, the receivables were pledged to HVB and a UCC1 financing statement was executed. Unknown to Richards this UCC1 expired and HVB failed to renew.

B.  In March 2007, Richards entered into a factor agreement with Expo Credit Corporation and assigned to EXPO all accounts for obligations to EXPO. Prior to the petition Date and during the applicable period Richards was obligated to pay all receivables to EXPO and EXPO would deduct their interest and fees and return the balance to Richards. Subsequent to the petition date, and pursuant to an interim cash collateral order by the Bankruptcy Court, EXPO was granted a first lien security interest and the right to collect up to 20% of all proceeds collected by Richards. EXPO also filed a notice of lending in connection with the Sciame Cooper Union Project

C.  In order for Richards to be able to perform the work at the Sciame Cooper Union Project, Richards and Sciame were required to enter into a number of Joint Check Agreements with key vendors. Richards entered into Joint Check Agreements with, Carrier Corporation, Buckley Associates, Accord Fabrication, Siemens Controls and FW Sims. The total amount represented by these vendors is more than 50% of the Cooper union Contract.

D.  From December 2008 forward Richards did not control which company received checks in connection with the Sciame Cooper Union Project. This includes Local 38. Sciame dictated the amounts to go to vendors that they deemed necessary to complete the project by paying such vendors with joint checks. See Sciame Verified Statement. They made payments to Local 28 (New York City Sheet Metal Union), Local 638 (New York City Sheet Metal Union), Siemens Controls, FW Sims, Buckley Associates and Carrier Corporation with funds due to Richards. Upon information and belief, Sciame did not make any payments to Local 38.

E.  On March 7, 2009, at a meeting with Steve Colletta and Robert DaRos, Sciame agreed to pay Richards on a time and material basis for completing the balance of the sheet metal work at the Sciame Cooper Union Project. See Examiner Post-Petition Taxes Report annexed as Exhibit F. Richards is still due more than $161,000 from Sciame for time and material work (post petition).

30. I have read the plaintiffs' motion papers and supporting documents and as stated more fully herein, I dispute the factual statements and the allegations in the report.

31. I have read the above statement and it is true and accurate to the best of my knowledge and recollection.

Sworn to before me on this
____ day of November 8, 2010.

_____
NOTARY PUBLIC

KAREN M. LAGER
Notary Public State of New York
No. 02LA6206673
Qualified in Westchester County
My Commission Expires May 26, 2013

_____
RICHARD J. HOPWOOD

15